Case No. 3:21-cv-01590-N

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

---

### In re: Highland Capital Management, L.P.,
### *Debtor*.

---

### James Dondero,
### *Appellant*,

### v.

### Highland Capital Management, L.P.,
### *Appellee*.

---

On Appeal from the United States Bankruptcy Court for
the Northern District of Texas, Adversary No. 20-03190
Hon. Stacey G.C. Jernigan, Presiding

---

### BRIEF OF APPELLANT JAMES DONDERO

---

Jeffrey S. Levinger
LEVINGER PC
1700 Pacific Avenue
Suite 2390
Dallas, Texas 75201
(214) 855-6817

John T. Wilson IV
Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900

**ATTORNEYS FOR APPELLANT JAMES DONDERO**

## CORPORATE DISCLOSURE STATEMENT

Appellant, James Dondero ("Mr. Dondero"), is a natural person and need not make a corporate disclosure. The Reorganized Debtor, Highland Capital Management, L.P., is a party to this appeal.

## LOCAL RULE 8012.1 CERTIFICATE OF INTERESTED PERSONS

Appellant, Mr. Dondero, certifies that the following list is, to the best of his knowledge, a complete list of all persons, associations of persons, firms, partnerships, corporations, guarantors, insurers, affiliates, parent corporations, and/or other legal entities who or which are financially interested in the outcome of this appeal.

1.  James Dondero (Appellant)

    Counsel:
    Jeffrey S. Levinger
    LEVINGER PC

    John T. Wilson IV
    Clay M. Taylor
    Bryan C. Assink
    BONDS ELLIS EPPICH SCHAFER JONES LLP

2.  Highland Capital Management, L.P. (Reorganized Debtor & Appellee)

    Counsel:

    Melissa S. Hayward
    Zachary Z. Annable
    HAYWARD PLLC

Jeffrey Pomerantz
Ira Kharasch
John A. Morris
Gregory Demo
Hayley Winograd
PACHULSKI STANG ZIEHL & JONES LLP

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**.......................................................... i

**LOCAL RULE 8012.1 CERTIFICATE OF INTERESTED PERSONS** ........... i

**TABLE OF CONTENTS** ...................................................................................... iii

**TABLE OF AUTHORITIES** ................................................................................. v

**JURISDICTIONAL STATEMENT** ..................................................................... 1

**STATEMENT REGARDING ORAL ARGUMENT** .......................................... 2

**ISSUES PRESENTED** ............................................................................................ 2

**INTRODUCTION** .................................................................................................... 5

**STANDARD OF REVIEW** ..................................................................................... 6

**STATEMENT OF THE CASE** ............................................................................... 7

**SUMMARY OF THE ARGUMENT** .................................................................... 16

**ARGUMENT** .......................................................................................................... 19

I.   THE BANKRUPTCY COURT ERRED BY HOLDING MR. DONDERO IN CONTEMPT
FOR CONDUCT THAT OCCURRED BEFORE THE ISSUANCE OF THE TRO. ................... 19
    **A.   A party cannot be held in contempt for actions taken when no court
order was in place**............................................................................................... 19
    **B.   The bankruptcy court impermissibly held Mr. Dondero in contempt
for conduct that occurred before the issuance of the TRO and was outside
the record.** ........................................................................................................... 20

II.   BECAUSE THE TRO DID NOT STATE ITS TERMS SPECIFICALLY OR DESCRIBE IN
DETAIL THE ACTS RESTRAINED, IT CANNOT SERVE AS THE BASIS FOR CIVIL
CONTEMPT. .............................................................................................................. 26
    **A.   Every order granting an injunction must comply with Rule 65(d).**..... 26
    **B.   The TRO did not comply with Rule 65(d) because it required
reference to other documents.**........................................................................... 29
    **C.   The TRO was insufficiently clear, definite and specific to support the
issuance of the Contempt Order.** ...................................................................... 36

III.   THE BANKRUPTCY COURT IMPROPERLY ASSESSED SANCTIONS AGAINST MR.
DONDERO. ................................................................................................................ 41
    **A.   The bankruptcy court lacked authority to assess a sanction that
punishes Mr. Dondero for exercising his right to appeal.**............................. 42

**B.   The Debtor failed to carry its burden of proving that its attorney's fees were reasonable and necessary**..............................................................45

**C.   The bankruptcy court's fee award lacks evidentiary support**............47

**D.   The bankruptcy court's fee award erroneously reimburses the Debtor for fees not caused by the alleged contemptuous conduct**.........................49

**CONCLUSION**...................................................................................................53

**CERTIFICATE OF SERVICE** .........................................................................55

**CERTIFICATE OF COMPLIANCE WITH RULE 8015(H)**..........................55

# TABLE OF AUTHORITIES

*Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574 (5th Cir. 2000) ...................6

*Am. Can Co. v. Mansukhani*, 742 F.2d 314 (7th Cir. 1984).....................................37

*Atlas Trading Conglomerate Inc. v. AT&T Inc.*,
    2018 U.S. Dist. LEXIS 33032 (N.D. Tex. 2018) ..........................................46

*Black v. SettlePou, P.C.*, 732 F.3d 492 (5th Cir. 2013)...........................................46

*Clark v. Boynton*, 362 F.2d 992 (5th Cir. 1966) .....................................................42

*Conner v. Travis County,* 209 F.3d 794 (5th Cir. 2000)...........................................44

*Fed. Trade Comm'n v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982) .....27

*Fox v. Vice*, 563 U.S. 826 (2011)..............................................................................50

*Franklin v. Elliott (In re Elliot),* 1994 U.S. App. LEXIS 41963 (5th Cir. 1994) ...44

*Ga. Power Co. v. NLRB*, 484 F.3d 1288 (11th Cir. 2007).......................................36

*In re Gervin*, 337 B.R. 854 (W.D. Tex. 2005).........................................................42

*Goodyear Tire & Rubber Co.,* 137 S. Ct. 1178 (2017) .....................................50, 52

*Grossman v. Belridge Grp. (In re Lothian Oil, Inc.),*
    531 F. App'x 428 (5th Cir. 2013).................................................................43

*In re Hipp, Inc.*, 895 F.2d 1503 (5th Cir. 1990)................................................42, 45

*Hornbeck Offshore Services, L.L.C. v. Salazar*, 713 F.3d 787 (5th Cir. 2013).........6

*Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254 (5th Cir. 2009).............6, 41, 42

*Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n,*
    389 U.S. 64 (1967)....................................................................................5, 36

*Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)....................46

*Law Office of Francis O'Reilly, Esq. v. Silene Fin. L.P. (In re DiBattista)*,
    2020 U.S. Dist. LEXIS 222877 (S.D.N.Y. Nov. 25, 2020) ...................44, 45

*MillerCoors LLC v. Anheuser-Busch Cos., LLC*,
    940 F.3d 922 (7th Cir. 2019) .................................................................. 16-17

*Oaks of Mid City Resident Council v. Sebelius*,
    723 F.3d 581 (5th Cir. 2013) ...........................................................16, 19, 36

*Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392 (5th Cir. 1987) ........1

*Piggly Wiggly Clarksville, Inc. v. Mrs Baird's Bakeries*,
    117 F.3d 380 (5th Cir. 1999) .........................................................................19

*Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795 (5th Cir. 2006)................17, 46

*Schmidt v. Lessard*, 414 U.S. 473 (1974) .........................................................27, 37

*Seattle-First Nat'l Bank v. Manges*, 900 F.2d 795 (5th Cir. 1990) ..................27, 31

*In re Skyport Glob. Communs., Inc.*,
    2013 Bankr. LEXIS 3218 (Bankr. S.D. Tex. 2013) ......................................19

*Thomas v. Brock*, 810 F.2d 448 (4th Cir. 1987) .....................................................27

*Topalian v. Ehrman*, 3 F.3d 931 (5th Cir. 1993) ...................................................47

*Tracfone Wireless, Inc. v. Brooks*,
    2014 U.S. Dist. LEXIS 174301 (N.D. Tex. 2014) ..................................27, 28

*Travelhost, Inc. v. Blandford*, 68 F.3d 958 (5th Cir. 1995).........................33, 36, 42

*United States Steel Corp. v. United Mine Workers*,
    598 F.2d 363 (5th Cir. 1979) .........................................................................35

*United States v. United Mine Workers*, 330 U.S. 258 (1947).................................42

*Wegner v. Standard Ins. Co.*, 129 F.3d 814 (5th Cir. 1997)...................................46

*Williams v. United States*, 402 F.2d 47 (10th Cir. 1967).......................................37

**Statutes**

28 U.S.C. § 158 ................................................................................................1

**Rules**

FED. R. CIV. P. 65(d) .............................................................................27, 28, 29

## JURISDICTIONAL STATEMENT

The Contempt Order at issue in this appeal is final and appealable because (i) the bankruptcy court had already issued its *Order Resolving Adversary Proceeding* before it issued the Contempt Order at issue in this appeal; and (ii) the Contempt Order imposes final, compensatory sanctions against Mr. Dondero.  *See Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 398, 400 (5th Cir. 1987).  As a result, this Court has jurisdiction over the appeal. *See id.*; 28 U.S.C. § 158(a)(1) ("[t]he district courts of the United States shall have jurisdiction to hear appeals … from final orders.").

On December 7, 2020, Debtor Highland Capital Management, L.P. initiated Adversary Proceeding No. 20-03190 with the filing of its *Verified Original Complaint for Injunctive Relief*, seeking solely injunctive relief against Mr. Dondero.  [R 006233] On December 10, 2020, the bankruptcy court issued its *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero*, and on January 11, 2021, the bankruptcy court issued its *Order Granting Debtor's Motion for a Preliminary Injunction Against James Dondero*. [R 006306, 006640]

The bankruptcy court heard the Debtor's *Motion For an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* on March 22 and 24, 2021.  The bankruptcy court issued its *Order*

*Resolving Adversary Proceeding* on May 18, 2021, expressly retaining "exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order." [R 008267]  As the bankruptcy court explained, it "entered a Preliminary Injunction and Agreed Injunction resolving this Adversary Proceeding but reserved jurisdiction to rule on the earlier-filed Contempt Motion." [R 000076]

On June 7, 2021, the bankruptcy court issued its *Memorandum Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO* ("Contempt Order"), which is the subject of this appeal. [R 000059]  Mr. Dondero timely filed his Notice of Appeal on June 15, 2021. [R 000001]

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Dondero respectfully requests oral argument.  This appeal presents important issues regarding the enforceability of injunction orders by contempt, including the requirement that injunction orders be clear and specific.

## ISSUES PRESENTED

1.      Did the bankruptcy court err in holding Mr. Dondero in contempt of the TRO based on conduct that occurred before the court issued the TRO?

2.      Did the bankruptcy court err in holding Mr. Dondero in contempt based upon a TRO that failed to state its terms specifically and to describe in reasonable

detail—and without reference to other documents—the act or acts restrained or required? Specifically:

> A.    Did the bankruptcy court err in holding that Mr. Dondero violated provisions of the TRO that referred to and required interpretation of two "Shared Services Agreements" between Mr. Dondero's companies and the Debtor?

> B.    Did the provision in the TRO that prohibited "communication with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero" have the requisite specificity by describing in reasonable detail the conduct to be restrained?

3.    Did the bankruptcy court impose sanctions that were improper and without evidentiary support? Specifically:

> A.    Did the bankruptcy court err in assessing an additional sanction of $100,000 for every level of rehearing or appeal that Mr. Dondero may choose to pursue?

> B.    Is the bankruptcy court's sanctions award without evidentiary support because it is based on attorney's fee statements that failed to prove that the fees sought were either reasonable or necessary?

C.     Is the bankruptcy court's sanctions award without evidentiary support because it is based on the Debtor's unsegregated fee statements, which consisted of 87 pages of time entries, many of which were for time periods and subject matter unrelated to the conduct held to be contemptuous?

D.     Is the bankruptcy court's sanction award improper because it is based on attorney's fees that were not caused by the conduct the bankruptcy court held to be contemptuous?

## INTRODUCTION

The judicial contempt power is a potent weapon.  When it is founded upon a decree too vague to be understood, it can be a deadly one.  Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

*Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

The Contempt Order violates this principle because it rests on an injunction that was too vague and too ambiguous for those restrained to know what conduct was forbidden.

Mr. Dondero established at the contempt hearing that he made a good faith effort to comply with the TRO.  But compliance proved to be an impossibility.  The TRO contained vague terms and phrases such as "express or implied threats," "interfering with or otherwise impeding, directly or indirectly," and "otherwise violating section 362(a) of the Bankruptcy Code."  The TRO also created a vague and ambiguous exception for communications made pursuant to agreements outside the TRO: "except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero."

The TRO was a trap calculated to snare Mr. Dondero as he navigated the bankruptcy, pursued an alternative plan to the one the Debtor proposed, and attempted to untangle his affiliated entities from the Debtor's business.

The bankruptcy court's TRO was not just a potent weapon, but a deadly one. And its Contempt Order holding that Mr. Dondero violated the TRO and imposing hundreds of thousands of dollars in sanctions is without evidentiary support and must be reversed.

## STANDARD OF REVIEW

In the appeal of a contempt order, the district court reviews a bankruptcy court's findings of fact for clear error, and its legal conclusions de novo. *Ingalls v. Thompson (In re Bradley)*, 588 F.3d 254, 261 (5th Cir. 2009). A bankruptcy court's assessment of monetary sanctions for contempt is reviewed for abuse of discretion. *Id.*; *see also Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000). A bankruptcy court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990).

Although this Court reviews contempt findings for abuse of discretion, "review is not perfunctory." *Hornbeck Offshore Services, L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013) (citations omitted). "Facts found by the district court will be accepted as true unless clearly erroneous, but 'the interpretation of the scope of the injunctive order[] is a question of law to be determined by the independent judgment of this Court.'" *Id.* (citation omitted, brackets in original).

## STATEMENT OF THE CASE

**A.      The history of the Bankruptcy Case.**

On October 16, 2019, Highland Capital Management, L.P. (the "Debtor")
filed a voluntary petition for relief in the U.S. Bankruptcy Court for the District of
Delaware, Case No. 19-12239 (the "Bankruptcy Case").  [R 000614]  At the time,
James D. Dondero ("Mr. Dondero"), the Debtor's co-founder, was the Debtor's
President and Chief Executive Officer and signed the voluntary petition for relief as
the President of Strand Advisors, Inc., the Debtor's General Partner.  [R 000607]
The Bankruptcy Case was later transferred to the U.S. Bankruptcy Court for the
Northern District of Texas, Dallas Division.  [R 000614]

In January 2020, the bankruptcy court signed an order approving an
agreement that allowed for the appointment of an independent board for the Debtor's
general partner (the "Board").  [R 000617]  James P. Seery, Jr. was a member of the
Board and was later retained as the Debtor's CEO.  [*Id.*]

**B.      The Debtor sought and obtained a TRO.**

On December 7, 2020, the Debtor initiated Adversary Proceeding No. 20-
03190 by filing its *Verified Original Complaint for Injunctive Relief*, seeking solely
injunctive relief against Mr. Dondero.  [R 006233]  The Debtor also filed an
emergency motion for a temporary restraining order against Mr. Dondero. [R
006276]

The Debtor's request for injunctive relief was based on certain actions that Mr. Dondero allegedly had taken in November 2020.  Specifically, the Debtor alleged that Mr. Dondero "interfered" with the Debtor's operations by preventing securities trades and issuing warnings and threats to the Debtor's employees, including the Debtor's CEO, Mr. Seery.  [R 006260]

The bankruptcy court issued an *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* (the "TRO") on December 10, 2020.  [R 006306] The TRO restrained Mr. Dondero from engaging in any of the following conduct:

(a)  Communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication;

(b)  Making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents;

(c)  Communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero;

(d)  Interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan;

(e)  Otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct"); and

(f)  Causing, encouraging, or conspiring with (i) any entity owned or controlled by him, and/or (ii) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct.

[R 006307-08]

## C.    The Debtor sought to hold Mr. Dondero in contempt of the TRO.

The Debtor sought a preliminary injunction with terms and provisions essentially identical to those contained in the TRO, and the Court set the Debtor's motion for a preliminary injunction for hearing on January 8, 2021.  [R 006276, 006285, 006289]

Shortly before the preliminary injunction hearing, the Debtor took Mr. Dondero's deposition.   On January 7, 2020 (the day before the preliminary injunction hearing), the Debtor filed a motion to hold Mr. Dondero in contempt for violating the TRO (the "Contempt Motion").  [R 006604]

The Contempt Motion sought to hold Mr. Dondero in contempt of the TRO for a number of alleged actions, including (i) "willful ignorance of the TRO,"[1] (ii) "throwing away his cell phone,"[2] (iii) "trespassing on the Debtor's Property,"[3] (iv)

---

[1] The bankruptcy court did not hold Mr. Dondero in contempt based on this allegation, and he therefore does not address it in this appeal.  [R 000106-08]

[2] The Debtor asserted that, although "throwing away his cell phone" was not an act specifically prohibited by the TRO, Mr. Dondero's "throwing away his cell phone" violated section 2(e) of the TRO, which prohibits "otherwise violating section 362(a) of the Bankruptcy Code."  [R 006308, 008891-93]  Because the bankruptcy court did not hold Mr. Dondero in contempt based on these allegations, Mr. Dondero does not address the cell phone allegation in this appeal. [R 000104-06]

[3] The Debtor asserted that, although the act of trespassing on the Debtor's property was not specifically prohibited by the TRO, Mr. Dondero's entry into the Debtor's offices to give a

"interfering with the Debtor's trading as portfolio manager," (v) "pushing and encouraging [non-party entities] to make further demands and threats against the Debtor," (vi) "communicating with the Debtor's employees to coordinate their legal strategy against the Debtor," and (vii) "preventing the Debtor from completing its document production."[4]  [R 006618-22, 000075-76]

On January 11, 2021, the bankruptcy court issued a preliminary injunction on terms essentially identical to the TRO's.  [R 006306, 006640][5]

## D.   Mr. Dondero objected and responded to the Contempt Motion.

Mr. Dondero filed a motion in limine on February 20, 2021, seeking to exclude evidence at the contempt hearing regarding actions that (i) predated the issuance of the TRO on December 10, 2020, and (ii) were not specifically prohibited by the TRO.  [R 007996][6]  The following day, Mr. Dondero filed his objection to

---

deposition was prohibited by a letter sent by Debtor's counsel to Mr. Dondero's counsel on December 23, 2020.  [R 006699]  Therefore, the Debtor contended that Mr. Dondero appearing at the Debtor's office violated section 2(e) of the TRO, which prohibits "otherwise violating section 362(a) of the Bankruptcy Code."  [R 006308, 008891, 008895-96]  Because the bankruptcy court did not hold Mr. Dondero in contempt based on these allegations, Mr. Dondero does not address the trespassing allegation in this appeal.  [R 000106-08]

[4] The bankruptcy court did not hold Mr. Dondero in contempt based on this allegation.  [R 000106-08]

[5] Mr. Dondero appealed the preliminary injunction, but the District Court denied leave. [R 006654, 008044]  Mr. Dondero then filed a Petition for Writ of Mandamus to the Fifth Circuit challenging the terms of the preliminary injunction as unclear, ambiguous, and overbroad.  [R 008060]  Mr. Dondero and the Debtor ultimately resolved the dispute of the underlying adversary proceeding, and Mr. Dondero voluntarily dismissed the mandamus proceeding on May 18, 2021. [R 008267]

[6] Specifically, the motion in limine sought to exclude the irrelevant and prejudicial evidence the Debtor sought to admit regarding the cell phone, trespass, and other alleged conduct that was not

---

the Contempt Motion, contending that (i) the TRO was not clear and unambiguous; (ii) the TRO violated Rule 65(d) by referring to sources and documents outside the face of the TRO; (iii) many of the alleged violations did not violate the TRO; (iv) the communications that allegedly violated the TRO were permitted under the shared services exception; and (v) the Debtor's broad request for damages, including attorney's fees for matters unrelated to the Contempt Motion, was improper. [R 008017]

### E.     The bankruptcy court heard the Contempt Motion.

On March 22 and 24, 2021, the bankruptcy court conducted an evidentiary hearing on the Contempt Motion.  [R 008880, 009158]  Before the hearing, the Debtor and Mr. Dondero agreed that each side would be allowed three and a half hours to present their arguments and examine witnesses.  [R 008900-03] At the outset of the hearing, the bankruptcy court stated:

> I'm just clarifying that point to make sure our evidence is carefully tailored here today.  I think it would only be evidence for activity between December 10, 2020 and January 7, 2021, because, again, you know, order entered December 10th, motion to hold Mr. Dondero in contempt filed January 7th.  So that doesn't pertain to any alleged violations of the preliminary injunction after it was issued on January 8th.

[R 008885]

---

specifically prohibited by the TRO, including Debtor's Exhibits 28-36, 40-47, and 54-55. [R.007996-8005]

The bankruptcy court also denied Mr. Dondero's motion in limine, stating:

> Mr. Wilson [counsel for Mr. Dondero], the one other housekeeping
> matter I had was I see on the docket that I never specifically entered an
> order on your motion in limine. I did remember telling you all at one
> point in open court right after it was filed that I was not inclined to grant
> it, but I want you to know that I'm not going to grant that. As you
> know, there's no jury. And as we judges tend to say in this context, we
> can weed out what is relevant versus irrelevant. And so I think we need
> to go ahead and sustain the objection on that and allow the full amount
> of testimony and evidence that Movant seeks to put in.

[R 008903-04]

During its opening statement, the Debtor specifically stated that it was not seeking to hold Mr. Dondero in contempt for pre-TRO conduct, including emails regarding the Debtor's November 2020 trading.[7]  [R 008885]

## F.    The bankruptcy court denied Mr. Dondero's request to reopen the evidence to present rebuttal testimony.

Before the Contempt Hearing, the Debtor deposed Scott Ellington, the Debtor's former general counsel. Both the Debtor and Mr. Dondero listed Mr. Ellington on their respective witness and exhibit lists for the Contempt Hearing. [R 006478, 007695]  But on the first day of the Contempt Hearing, the Debtor announced that it would not call Mr. Ellington, and his counsel asked that he be released. [R 008900-02]  Mr. Dondero's counsel initially stated that Mr. Dondero

---

[7] During the hearing, Mr. Dondero objected to the admission of exhibits related to any pre-TRO conduct, including the November 24, 2020 emails. [R 008912]  The Debtor subsequently withdrew several of these exhibits, including the emails. [R 009148]

still intended to call Mr. Ellington, but after consideration and discussion, Mr. Dondero ultimately agreed to release Mr. Ellington, deciding that his testimony would be cumulative of the testimony of Mr. Dondero and Mr. Seery. [R 008902, 009063]

During Mr. Dondero's questioning of Mr. Seery, Mr. Seery expressly denied several important matters that Mr. Ellington had testified to in his deposition.  For instance, Mr. Ellington had testified that he was tasked to be a "go-between" from Mr. Seery to Mr. Dondero from the inception of the Board.  [R 008223]  The Board would ask Mr. Ellington to carry messages to Mr. Dondero and to elicit certain information from Mr. Dondero.  [*Id.*]  Mr. Ellington testified that Mr. Dondero referred to this role as "settlement counsel."  [R 008222-23]  He also testified that, after the entry of the TRO, on December 10, Mr. Seery did not instruct him to stop communicating with Mr. Dondero [R 008226], but instead told him to answer Mr. Dondero's phone calls.  [*Id.*]  Indeed, Mr. Seery told Mr. Ellington that he could talk to Mr. Dondero's counsel, Michael Lynn, "as much as you want, he's an ethical guy."  [*Id.*]  Even after the TRO, Mr. Ellington testified that he "was being tasked directly by Mr. Seery to have conversations on specific items with Mr. Dondero."  [R 008227-28]  Mr. Seery even tasked Mr. Ellington with such a role as late as January 4 or 5, 2021.  [R 008223-24]

After hearing Mr. Seery's contradictory testimony, Mr. Dondero desired to call Mr. Ellington as a live witness, but Mr. Ellington had already been released from the hearing. [R 009153-54] The Debtor then rested after Mr. Seery's testimony concluded. [R 009153-54] The bankruptcy court noted that Mr. Dondero's counsel did not have any other witnesses to call, as Mr. Ellington had been released. [R 009153-54]

Mr. Dondero then filed a motion to reopen the evidence before the second day of the Contempt Hearing on March 24, 2021, requesting that he be allowed to call Mr. Ellington to provide brief rebuttal testimony, attaching excerpts from Mr. Ellington's deposition. [R 008202-04, 008209]

The bankruptcy court heard argument and denied the motion to reopen at the start of the hearing. [R 009163-75, 008241]

## G.   The bankruptcy court held Mr. Dondero in contempt of the TRO and sanctioned him in an amount exceeding $550,000.

On June 7, 2021, the bankruptcy court issued its *Memorandum Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO* ("Contempt Order"), the order at issue in this appeal. [R 000059]

In the Contempt Order, the bankruptcy court found that Mr. Dondero violated the TRO by (i) interfering with the Debtor's trading; and (ii) communicating with certain of the Debtor's employees on matters unrelated to the shared services

agreements.   [R 000059]   The bankruptcy court assessed a sanction against Mr. Dondero in the amount of $450,000. [R 000056] Additionally, the bankruptcy court included "a sanction of $100,000 for each level of rehearing, appeal, or petition for certiorari that Mr. Dondero may choose to take."  [R 000057]

Mr. Dondero timely appealed from the Contempt Order. [R 000001]

# SUMMARY OF THE ARGUMENT

In a civil contempt proceeding based on the alleged violation of an injunction, the party seeking an order of contempt must establish by clear and convincing evidence that: "(1) the . . . injunction was in effect at the time of the [respondent's] supposedly contemptuous conduct; (2) the injunction, neither vaguely nor ambiguously, required the [respondent] to perform or abstain from certain conduct; and (3) the [respondent] failed to comply with the injunction's requirement(s)." *Oaks of Mid City Resident Council v. Sebelius*, 723 F.3d 581, 585 (5th Cir. 2013). The Contempt Order here is utterly inconsistent with these requirements.

When the Debtor sought the TRO on December 7, 2020, it contended that Mr. Dondero interfered with the Debtor's trading by sending emails around Thanksgiving of 2020. The TRO issued on December 10, 2020. The bankruptcy court erred by holding Mr. Dondero in contempt for conduct that occurred the week of Thanksgiving 2020 because the TRO was not yet in effect when that conduct occurred.

Further, the TRO was vague and ambiguous because it failed to state its terms specifically or describe in detail the acts to be restrained in accordance with Rule 65(d). The purpose of Rule 65(d)'s specificity requirements is to "ensure[] that a party who is restrained by a preliminary injunction knows clearly what conduct is being restrained and why." *MillerCoors LLC v. Anheuser-Busch Cos., LLC*, 940

F.3d 922, 924 (7th Cir. 2019).  The TRO's terms failed to provide Mr. Dondero that fundamental information.

Moreover, the TRO impermissibly referred to outside documents, including two "Shared Services Agreements" between the Debtor and two entities affiliated with Mr. Dondero.  The TRO prohibited Mr. Dondero from communicating with the Debtor's employees "except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero."  [R 006308]  The bankruptcy court erred in holding that Mr. Dondero violated this provision of the TRO because it required reference to documents outside the TRO and was too vague and ambiguous to be understood.

The bankruptcy court additionally erred by assessing "a sanction of $100,000 for each level of rehearing, appeal, or petition for certiorari that Mr. Dondero may choose to take." That award was a punitive sanction that the bankruptcy court had no authority to enter.  [R 000112]

Finally, the bankruptcy court erred in assessing and awarding damages in the Contempt Order.  The Debtor sought an award of its attorney's fees as a sanction. A party seeking attorney's fees is "charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving that they exercised billing judgment." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006).  Here, the Debtor failed to meet its burden of showing the

reasonableness and necessity of the fees it sought.  Instead, the Debtor submitted 87

pages of unsegregated fee statements, without a sponsoring witness or affidavit.  The

fee records covered a time period far broader than the period at issue and contained

time entries for multiple tasks unrelated to the Contempt Motion.  Compounding the

problem, the bankruptcy court made assumptions about additional fees beyond those

supported by any evidence, and it erroneously compensated the Debtor for attorney's

fees that were not caused by the allegedly contemptuous conduct.

# ARGUMENT

## I.    The bankruptcy court erred by holding Mr. Dondero in contempt for conduct that occurred before the issuance of the TRO.

### A. A party cannot be held in contempt for actions taken when no court order was in place.

In a civil contempt proceeding based on the alleged violation of an injunction, the party seeking an order of contempt must establish by clear and convincing evidence that: (1) the . . . injunction was in effect at the time of the [respondent's] supposedly contemptuous conduct; (2) the injunction, neither vaguely nor ambiguously, required the [respondent] to perform or abstain from certain conduct; and (3) the [respondent] failed to comply with the injunction's requirement(s)." *Oaks of Mid City Resident Council v. Sebelius*, 723 F.3d 581, 585 (5th Cir. 2013) (emphasis added).   The requirement that the moving party demonstrate that the "court's order was in effect at the time of the alleged conduct" is especially important. *In re Skyport Glob. Communs., Inc.*, No. 10-03150, 2013 Bankr. LEXIS 3218, at *155 (Bankr. S.D. Tex. 2013) (citing *Piggly Wiggly Clarksville, Inc. v. Mrs Baird's Bakeries*, 117 F.3d 380, 382 (5th Cir. 1999)). The bankruptcy court erred by failing to hold the Debtor to that burden.

**B. The bankruptcy court impermissibly held Mr. Dondero in contempt for conduct that occurred before the issuance of the TRO and was outside the record.**

> **1.    The bankruptcy court held Mr. Dondero liable for conduct that had already occurred before the TRO was issued.**

The bankruptcy court held that "there is clear and convincing evidence that Mr. Dondero violated" section 3(a) of the TRO, which prohibited him from "causing, encouraging, or conspiring with any entity owned or control by him" from engaging in the Prohibited Conduct.   [R 000103, 006308]   According to the bankruptcy court, the Prohibited Conduct Mr. Dondero engaged in was "interfering with or otherwise impeding" the Debtor's "decisions concerning disposition of assets controlled by the Debtor."  [*Id.*]

The bankruptcy court had correctly noted that "this Contempt Motion *deals solely with whether Mr. Dondero violated the TRO after its entry on December 10, 2020 at 1:31 p.m., CST, up through the time of the filing of the Contempt Motion on January 7, 2021*."  [R 00076 (emphasis in original)]  Nevertheless, with respect to its determination that Mr. Dondero violated section 3(a) of the TRO, the bankruptcy court *only* considered and relied upon conduct that occurred in November 2020— weeks before the entry of the TRO.  Indeed, the bankruptcy court held Mr. Dondero in contempt for the same conduct that the Debtor had alleged as a basis for *seeking* the TRO. [*Compare* R 006265, *with* R 000034, 000039, 000048-49]

On page 14 of the Contempt Order, the bankruptcy court noted that the TRO was issued for conduct including the following:

> ***In the November 24-27, 2020 time period*** (again, just a few weeks after Mr. Dondero's termination from the Debtor), Mr. Dondero sent various emails to both Debtor and Advisor employees (*e.g.*, Matt Pearson, Hunter Covitz, Joe Sowin, and Tom Surgent) telling them he had instructed the Debtor not to engage in trades of Highland CLO assets that Mr. Seery had instructed them to make.

[R 000017 (emphasis added)]

At the Contempt Hearing, Debtor's counsel reminded the bankruptcy court that interference with trading around Thanksgiving was part of the Debtor's reason for seeking the TRO:

> Now, you remember, when we got the TRO, one of the things that happened – and I'm not saying that this is a violation of the TRO, I'm just trying to provide some context, and you'll hear it from Mr. Dondero himself – one of the reasons we got the TRO is, remember about Thanksgiving, he interfered with Mr. Seery's attempt to sell AVYA and SKY stock on behalf of the CLOs, right"  And that's where he made the threat to Mr. Surgent, right?

[R 008897]

The Debtor informed the bankruptcy court, however, that it was not seeking to hold Mr. Dondero in contempt for the Thanksgiving conduct; instead, it argued that Mr. Dondero again interfered with the Debtor's trading on December 22, 2020, after the TRO was entered:

> He does the exact same thing on December 22nd.  He engages in the exact same conduct that formed the basis of the TRO just 12 days after the TRO was entered.

[*Id.*]

But despite this statement, the Debtor presented no *evidence* that Mr. Dondero interfered with any trades in December 2020. Mr. Dondero acknowledged his role in the interference with trades in the Thanksgiving time frame before the TRO. [R 008956, 008958-59] He testified as follows at the Contempt Hearing:

> I've been as clear as I can be. I take much umbrage in capricious, wanton destruction of investor value. And I interfered with the trades around Thanksgiving directly by telling the traders that they shouldn't put the trades through, there's no business purpose, there's no rationale, that the investors that control a vast majority of the CLOs are going to move the contracts and they don't want the securities trade. So, yes, I objected strenuously in the November Thanksgiving time frame.

[R 009010]

Mr. Dondero, however, unequivocally and repeatedly denied that he had interfered in any way with the Debtor's trading after the TRO was entered on December 10, 2020:

> Q    Sir, you personally instructed employees of the Advisors not to execute the very trades that Mr. Seery wanted executed. Correct?
>
> A    Not on December 22nd. The week before Thanksgiving, yes. I respected the – I respected the TRO and the week of Christmas trade that also gave a multimillion dollar loss to the Funds. I just asked Jason Post to look at the trades.

[R 008958]

> Once the TRO was in effect, I respected the TRO. I respected the Court. I did not call anybody. There's no evidence of me calling anybody. No one said I called anybody. I just sent one email to Jason Post, *a non-Highland employee*, that he should look at the trades.

[R 008959-60 (emphasis added)]

> As far as December 20th is concerned … there is no evidence of me talking to anybody other than Jason Post, who is a NexPoint employee, *not a Highland employee*, and just saying, you know, Jason, you need to take a look at these trades.

[R 009010 (emphasis added)]

> I mean, just to repeat, again, I did nothing regarding the December 20th trades except for one email to Jason Post saying you should take a look at it. I never followed up with him. I never knew what he was doing.

[R 009011]

The bankruptcy court acknowledged Mr. Dondero's testimony in the Contempt Order: "Mr. Dondero testified at the hearing on the Contempt Motion that he may have interfered with trades the week of Thanksgiving, but he did not after the entry of the TRO." [R 000090] The bankruptcy court even observed that "[a]t issue here, in particular, are the Debtor's attempted sales in late December 2020—after the entry of the TRO." [R 000089]

Nevertheless, the bankruptcy court held Mr. Dondero in contempt *solely* for his actions around Thanksgiving—*two weeks before the entry of the TRO*. The court based its finding of interference on the following conduct:

> Mr. Dondero testified at a deposition on January 5, 2021, that he gave instructions to a Debtor employee, Hunter Covitz, not to sell "SKY" equity after Mr. Covitz had been instructed by Mr. Seery to sell it. He also testified that he communicated with an employee named Matt Pearson, an equity trader, informing him that certain Non-Debtor Highland Related Entities ("HFAM" and "DAF")—who were investors in the NexPoint/HCMFA Funds—had "instructed Highland in writing

not to sell any CLO underlying assets.   There is potential liability.
Don't do it again." Matt Pearson, in response, canceled scheduled sales
of SKY as well as AVYA.

[R 000090]

Notably, the conduct described in the above paragraph is the **exact same
conduct** that the court described on page 14 of the Contempt Order, which
indisputably occurred "[i]n the November 24-27, 2020 time period," before the TRO
was in effect.  [R 000072]

The bankruptcy court's impermissible reliance on pre-TRO conduct as the
basis for its Contempt Order is confirmed by its citations to the record, which were
excerpts from Mr. Dondero's deposition testimony on January 5, 2021. In that
deposition, Mr. Dondero was questioned about emails he sent between November
24 and November 27, 2020.[8]  [R 000089, 006826-27]  The email chain was exhibit
3 to the deposition.[9]  [R 006826] In the email chain, on November 24, 2020, Hunter
Covitz (a Debtor employee) sent an email to Matt Pearson and Joe Sowin (also
Debtor employees) directing them to sell certain securities in the CLOs.  [R 006675,

---

[8] The Debtor did not list the January 5, 2021 deposition transcript  as an exhibit at the Contempt
Hearing.  Instead, the Declaration of John A. Morris, the Debtor's counsel, was listed as an exhibit
on the Debtor's Witness and Exhibit List.  [R 006760]  Although not specifically listed as an
hearing exhibit, the January 5 deposition was electronically filed with the Declaration.  Mr.
Dondero objected to the admission of the Morris Declaration in his motion in limine, stating that
it was irrelevant to the resolution of the Contempt Motion.  [R 007996-8005]

[9] The Debtor offered that deposition exhibit as Exhibit 5 in the Contempt Hearing.  [R 006480,
006674 (Vol. 28)]  But the Debtor withdrew that exhibit after Mr. Dondero's counsel objected to
it.  [R 008912, 009148]

006826]   Mr. Dondero received the email and responded, "No…… do not."
[R 006826-27, 006675]  Pearson responded the same day that he canceled the sales
after a small amount were completed.  [R 006675]

The Contempt Order even quoted Mr. Dondero's email of November 24,
2020:  "HFAM and DAF has instructed Highland in writing, not to sell any CLO
underlying assets…. there is potential liability, don't do it again please." [R 000090,
006674] But this pre-TRO conduct cannot support the Contempt Order as a matter
of law. And without evidence of any post-TRO conduct that violated section 3(a),
the Contempt Order is impermissible and must be reversed.

> ## 2.     The bankruptcy court strayed outside the record in holding that Mr. Dondero violated the TRO.

Not only did the bankruptcy court err by holding Mr. Dondero in contempt
for his pre-TRO conduct in November 2020, its findings regarding the pre-TRO
Thanksgiving trades were not based on any evidence admitted at the Contempt
Hearing.  In fact, the November 2020 email string was not part of the record of the
Contempt Hearing because the Debtor withdrew the exhibit after Mr. Dondero's
counsel objected to it.  [R 008912, 009148]  Moreover, the Debtor made clear at the
Contempt Hearing that it was not seeking to hold Mr. Dondero in contempt for the
Thanksgiving conduct.

By straying outside the record, the bankruptcy court erroneously held Mr.
Dondero in contempt for conduct that it acknowledged had occurred in November

2020 (and led to the entry of the TRO).  [*Compare* R 000072 *with* R 000089, 000103-04]  The entirety of the conduct underlying the court's finding of a section 3(a) violation occurred between November 24 and 27, 2020, before section 3(a) was even in effect.

And no evidence controverts Mr. Dondero's unequivocal testimony that he did not interfere with any trades in December 2020.  In fact, Mr. Seery testified that the Debtor did not fail to execute any trades in December 2020.  [R 009128]  He further testified that every trade the Debtor initiated in December 2020 closed. [R 009133] Because no evidence supports the bankruptcy court's determination that Mr. Dondero violated section 3(a) of the TRO, its order holding Mr. Dondero in contempt is erroneous and must be reversed.

## II.  Because the TRO did not state its terms specifically or describe in detail the acts restrained, it cannot serve as the basis for civil contempt.

### A. Every order granting an injunction must comply with Rule 65(d).

The Bankruptcy Court also erred in holding Mr. Dondero in contempt of the TRO because the TRO did not comply with Rule 65(d), which provides:

Every order granting an injunction and every restraining order must:

(A)    state the reasons why it issued;

(B)    state its terms *specifically*; and

(C)    describe in reasonable detail—and *not by referring to the complaint or other document*—the act or acts restrained or required.

Fed. R. Civ. P. 65(d) (emphasis added).

"If an injunction fails to state the reasons for its issuance, incorporates other documents by reference, or is otherwise not specific in its terms, the injunction fails to comply with Rule 65(d)." *Tracfone Wireless, Inc. v. Brooks*, Civil Action No. 3:07-CV-2033-L-BK, 2014 U.S. Dist. LEXIS 174301, at *17 (N.D. Tex. 2014). "'[The] no-reference requirement [of Rule 65(d)] has been strictly construed in this circuit,' to require that the parties be able 'to interpret the injunction from the *four corners of the order* as required by Rule 65(d).'" *Seattle-First Nat'l Bank v. Manges*, 900 F.2d 795, 800 (5th Cir. 1990) (quoting *Fed. Trade Comm'n v. Southwest Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982) (emphasis added)).

Rule 65(d) is phrased in mandatory language. "[It] expressly proscribes the issuance of an injunction which describes the enjoined conduct by referring to another document." *Thomas v. Brock*, 810 F.2d 448, 450 (4th Cir. 1987). The Fifth Circuit strictly construes Rule 65(d) because parties are entitled to be able to interpret injunctions and restraining orders "from the four corners of the order." *Seattle-First Nat'l Bank*, 900 F.2d at 800. Without such clear and unambiguous language, parties would impermissibly be subject to contempt based on court orders that are too vague to be understood. *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam) ("The Rule was designed to prevent uncertainty and confusion on the part of those

faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.").

These principles were illustrated in *Tracfone Wireless, Inc. v. Brooks*, where the court held that an injunction was not enforceable against a party because it violated Rule 65(d).  2014 U.S. Dist. LEXIS 174301, at *17 (N.D. Tex. 2014).  The injunction provided that Brooks was prohibited from:

> purchasing or selling any wireless mobile phone that [she knows] or should know bears any TracFone Trademark, any other trademark owned or used by TracFone, or any other model of wireless mobile phone sold or marketed by TracFone ("TracFone/NET10 Handsets"). Specifically, the [Defendant is] enjoined from purchasing or selling all models of TracFone/NET10 Handsets currently offered for sale by TracFone, or that may be offered for sale in the future, as listed and updated from time to time on TracFone's and NET10's websites, http://TracFone.com/activation_pick_brand.jsp and www.net10.com, including without limitation the following TracFone/NET10 handsets [followed by a list of 18 model numbers].

*Id.* at *4.  In concluding that this provision was unenforceable, the court held:

> Further, while Plaintiff contends that Defendants have violated the injunction by "purchasing or selling any wireless mobile phone that they know or should know bears [1] any TracFone Trademark, [and] [2] any other trademark owned or used by TracFone," *the only way to make this determination is to refer to a list of Plaintiff's trademarks, and no such list is included within the order granting the injunction*. This violates the no-reference rule and fails to comply with Rule 65(d)(1)(C).

*Id.* at *17-18 (emphasis added).

### B. The TRO did not comply with Rule 65(d) because it required reference to other documents.

The TRO on which the Contempt Order was based violates Rule 65(d) in several significant ways.  Section 2(c) of the TRO restrained Mr. Dondero from "communication with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero."  [R 006308]  This prohibition has an ambiguous exception that is based on two documents outside the TRO itself:  (i) the Amended and Restated Shared Services Agreement between NexPoint Advisors, L.P. ("NexPoint") and the Debtor, effective January 1, 2018, and (ii) the Second Amended and Restated Shared Services Agreement between Highland Capital Management Fund Advisors, L.P. ("HCMFA") and the Debtor, effective February 8, 2013 (collectively, the "Shared Services Agreements").[10]  [R 007700, 007719, 007193-200]

Under the Shared Services Agreements, the Debtor provided a variety of back-office services to NexPoint and HCMFA, including in the areas of information technology, legal and compliance, accounting, telecom, and administrative and

---

[10] In its opening statement at the Contempt Hearing, the Debtor argued that "You might hear, oh, oh, these communications were about shared services.  [Mr. Dondero] will never be able to prove that because they have not put on their exhibit list any shared services agreement."  [R 008889-90]  The Debtor was wrong.  Not only did Mr. Dondero include the Shared Services Agreements as Exhibits 1 and 2 on his Exhibit List, but (1) the Shared Services Agreements were admitted into evidence; (2) it was not Mr. Dondero's burden to show by clear and convincing evidence that he did *not* violate the TRO; and (3) under Rule 65(d), Mr. Dondero should not be required to refer to documents outside the TRO to determine if his conduct is proper.  [R 007700, 007719, 009032]

secretarial support.  [R 009033-37, 007702-04, 007721, 007193-7200]  NexPoint and HCMFA did not hire their own lawyers and accountants.  Instead, under these agreements, the Debtor's employees would often wear multiple hats by working for the Debtor, NexPoint, and HCMFA to provide the shared services.  [R 009034-35, 007193-7200]  This is a common arrangement in the financial services industry, where "there's generally a centralized model for high-cost people in the legal, accounting, and tax arena so that each subsidiary doesn't have to have their own expensive, duplicative set of employees." [R 009035, 007193-200 (testimony of Mr. Dondero)]

Mr. Dondero is the president and an employee of both NexPoint and HCMFA. [R, 007193-200, 009051]  As an employee and representative of these two entities, Mr. Dondero would routinely  confer with the Debtor's employees under the Shared Services Agreements related to these services.  [R 007193-200, 009050-51]

The TRO purported to restrict Mr. Dondero's communications with the Debtor's employees "except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero."  [R 006307-08]  By explicitly referring to "shared services" being provided "to affiliates owned or controlled by Mr. Dondero," such as NexPoint and HCMFA, the TRO improperly purports to incorporate the terms of the Shared Services Agreements.  By doing so, the TRO violated Rule 65(d) because its prohibitions required him and other parties

to refer to and interpret documents outside the four corners of the TRO.  *See Seattle-First Nat'l Bank*, 900 F.2d at 800.

This Rule 65(d) violation is particularly significant because the bankruptcy court's Contempt Order and imposition of sanctions were based in part on Mr. Dondero's communications with employees who were subject to the Shared Services Agreements.   Specifically,  the  court  held  Mr.  Dondero  in  contempt  for communicating with (i) in-house lawyers, and (ii) accountants and/or administrative or secretarial staff.  As the court stated: "[i]t is apparent from the evidence (numerous emails) that Mr. Dondero communicated with Highland inhouse general counsel Scott Ellington (who was terminated from Highland in January 2021) about all kinds of  things  post-TRO  *other*  than  shared  services,  including  Mr.  Dondero's  own personal litigation strategies."  [R 000094 (emphasis in original)]

But the evidence established that Mr. Dondero reasonably believed that all the communications he had with Debtor's employees were entirely permissible under the shared services exception to the TRO.  For instance, Mr. Dondero testified at the Contempt Hearing:

> Q      Were you aware that on December 10th you were retrained from communicating  with  any  of  the  Debtor's  employees  except  as  it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero?
>
> A      Yes

Q      And did you knowingly do anything to violate this provision of the TRO?

A      No.  I said this before, probably not in the right format on whatever it was, cross or direct earlier, but shared services was a broad, multifaceted discussion that a lot of people were in and moving towards for three or four months.  It included systems, it included accounting personnel, it included what was going to happen to 40-odd employees, which asset management contracts were potentially going to move or not move.  At one point, the CLOs [collateralized loan obligations] were, and then those CLOs weren't.  You know, whatever.

So, there was – it was not just about moving back office.  It was also about front office and valuation and whether or not there was going to be an overall settlement, whether or not the pot plan was going to work out, whether or not there was going to be an ability to buy out individual creditors.  All those things were being explored, as you saw in the emails earlier, like with Clubok.  There was a – exploring buying out his interest or changing his dynamics.

There was also conversations where Redeemer Committee had agreed to sell their interest in Cornerstone for ninety million bucks but then changed their mind.

There was agreements with – there was negotiations going on all over the place.  And I needed help, since I'd been isolated, and Scott Ellington, as my settlement counsel, or as the go-between with Seery and with the creditors, was an important piece of trying to get something done.

[R 009013-15]

As this uncontroverted testimony demonstrates, the TRO created an obvious problem: there can be—and in fact are—differing interpretations of what the TRO meant by "except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero."  [R 006308]

The majority of the communications that the Debtor alleged violated the TRO were between Mr. Dondero and Scott Ellington, the Debtor's general counsel. [R 009050]  But under the Shared Services Agreements, Mr. Ellington was also an employee of NexPoint and HCFMA.   [R 007704, 007721, 009037] And any communications with him in that capacity were permissible.

Of the twelve emails and text messages presented at the Contempt Hearing, ten were communications with Mr. Ellington.  [*See* R 006730, 006732, 006735, 006737, 006739, 006747, 006753, 007593, 007595, 007597, 007601, 007606]  Of those ten, four were emails from Mr. Dondero's counsel, not Mr. Dondero himself.[11] [R 006730, 006747, 007593, 007595] The two communications to persons other than Mr. Ellington were text messages from Mr. Dondero to Isaac Leventon (another lawyer in the Debtor's legal department) and Melissa Schroth (an accountant employed the Debtor).  [R 006737, 006735, 08966, 008980, 008987, 009056]  Both were covered by the Shared Services Agreements, and thus were shared employees of NexPoint and HCFMA.  [R 009033-37, 007702-04, 007721, 009037]

---

[11] One of the emails the Debtor offered and the bankruptcy court relied upon did not even include Mr. Dondero or his counsel in the thread.  [R 006753]  The email thread was ultimately forwarded by Grant Scott to Mr. Ellington.  It appears that the only connection to Mr. Dondero was the subject line of the email, which stated: "It appears Jim will be available for a 9AM CT call.  Can the K&L people make it?"  [*Id.*]  This email does not constitute clear and convincing evidence that Mr. Dondero violated the TRO.  *See Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995).

The TRO exemplifies the problem with an injunction that makes reference to another document: How was Mr. Dondero to know what constituted "shared services" under the TRO? His understanding of what those agreements meant varied fundamentally from the Debtor's understanding—and apparently, the bankruptcy court's as well.

Based on his understanding of the Shared Services Agreements, Mr. Dondero unequivocally denied that he communicated with the Debtor's employees about any matters prohibited by the TRO, including matters adverse to the Debtor's interests:

> Q      Sir, between the time the TRO was entered and the preliminary injunction was entered, you communicated with certain of the Debtor's employees about matters that were adverse to the Debtor's interest, correct?
>
> A      Absolutely not. I respectfully disagree with that characterization whenever it occurs.

[R 008967]

The communications themselves confirm that they were not against the Debtor's interests. [*See* R 006730, 006732, 006735, 006737, 006739, 006747, 006753, 007593, 007595, 007597, 007601, 007606] But while the benign nature of Mr. Dondero's communications is instructive, it is beside the point. The reason a dispute even exists about Mr. Dondero's communications with the Debtor's employees is because the TRO violated Rule 65(d) by referring to an "other

document" outside the face of the TRO.[12]  By doing so, the TRO failed to clearly and unambiguously identify the purported communications restrained.   Mr. Dondero, who routinely communicated with Debtor's legal, accounting, secretarial, and IT departments under the Shared Services Agreements, was simply unable to ascertain from the face of the TRO the extent of the prohibitions.

The record demonstrates Mr. Dondero did his best to comply with the TRO by communicating only with the Debtor's employees who were subject to the Shared Services Agreements.[13]  *See United States Steel Corp. v. United Mine Workers,* 598 F.2d 363, 368 (5th Cir. 1979) (holding that substantial compliance is a defense to contempt of an injunction). The Order of Contempt therefore could not permissibly be based on the vague and ambiguous terms of section 2(a) of the TRO, and it must be reversed for this additional reason.

---

[12] In addition to the TRO's reference to the Shared Services Agreements, section 2(e) of the TRO contained a provision enjoining and restraining Mr. Dondero from "otherwise violating section 362(a) of the Bankruptcy Code."  [R 006308]  The reference to section 362(a) impermissibly references another document outside the four corners of the TRO.  Nevertheless, despite the Debtor's requests, the bankruptcy court did not hold Mr. Dondero in contempt of section 2(e).

[13] It is noteworthy that the Preliminary Injunction, which replaced the TRO on January 11, 2021, contained substantially similar provisions to the TRO.  [R 006640]  The Preliminary Injunction contained the shared services exception, but also contained an express prohibition against Mr. Dondero communicating with Scott Ellington or Isaac Leventon in any respect.  [R 006643]  The TRO contained no such provision expressly prohibiting Mr. Dondero from communicating with Mr. Ellington or Mr. Leventon.  [R 006306]  The Order Resolving Adversary Proceeding (the agreed, final injunction) contains neither the shared services exception nor the absolute prohibition of communications with Mr. Ellington and Mr. Leventon.  [R 008267]

### C. The TRO was insufficiently clear, definite and specific to support the issuance of the Contempt Order.

"A party commits contempt when he violates *a definite and specific order* of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (emphasis added). Therefore, a party moving for civil contempt has the burden of proving by clear and convincing evidence that "(1) the allegedly violated order was valid and lawful; (2) *the order was clear and unambiguous*; and (3) the alleged violator had the ability to comply with the order." *Ga. Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007) (emphasis added). *See also Oaks of Mid City Resident Council v. Sebelius*, 723 F.3d 581, 585 (5th Cir. 2013). As the Supreme Court has stated:

> The judicial contempt power is a potent weapon. *When it is founded upon a decree too vague to be understood, it can be a deadly one.* Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

*Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (emphasis added).

"Although any injunction may present problems of interpretation, the injunction must be clear enough and specific enough to fairly apprise the enjoined party of the prohibited conduct. 'Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive

explicit notice of precisely what conduct is outlawed.'" *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 332 (7th Cir. 1984) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).  Accordingly, an injunction "cannot be so general as to leave the party open to the hazard of conducting business in the mistaken belief that it is not prohibited by the injunction and thus make him vulnerable to prosecution for contempt." *Williams v. United States*, 402 F.2d 47, 48 (10th Cir. 1967).  But that is precisely what happened in this case.

The TRO was insufficiently clear and unambiguous to permit Mr. Dondero to know exactly what the bankruptcy court intended to forbid.  Mr. Dondero testified repeatedly that he tried to comply with the TRO:

> "When the TRO was put in, I changed my behavior materially."
> [R 008910]

> "Once the TRO was in effect, I respected the TRO.  I respected the Court."
> [R 008959]

> "I take seriously anything that comes from the Court, and I did adjust my behavior."

[R 009008]

> Q      So you took the TRO seriously?

> A      Absolutely.

> Q      And the TRO was important to you?

> A      Well, I – yes.  I mean I understood, I respected, you know, I modified my behavior, but I still had my views on what's proper for the

estate and what's proper for investors, so I have to reflect those, you know, differently or indirectly.

[R 009011-12]

> Q      Did you take any action – did you take any action after December 10, 2020 to – that you understood might violate the TRO?

> A      No.  And again, with the goal of trying to transition employees fairly, make up to them the fact that their 401(k) contributions were canceled, their 2019 bonuses were canceled, their 2020 bonuses were canceled.  You know, I tried to do what was best and fair for everybody, but not in a way that disrupted the Debtor or even contacted, you know, people directly.

[R 009012]

Nevertheless, because the Debtor's interpretation of what conduct was permissible under the TRO varied materially from Mr. Dondero's interpretation, compliance with the TRO became a function of the Debtor's and the bankruptcy court's *post-hoc* views of what was proper and improper.

That the TRO was not clear and specific enough to give Mr. Dondero explicit notice of the prohibited conduct is demonstrated by the shared services exception, as discussed in the preceding section.  Compounded by the fact that the TRO impermissibly required Mr. Dondero to refer to other documents to interpret the TRO, the shared services exception was reasonably subject to different interpretations about its breadth and effect. As Mr. Dondero explained:

> Q      This email string and the letter have nothing to do with shared services, correct?

A       Okay.  Broadly, shared services includes everything trying to get
a settlement of what to do with the employees.  And so I, again, I view
it broadly as yes.

[R 009004]

Indeed, Mr. Dondero reasonably believed that communications with the

Debtor's lawyers and accountants was permissible under the Shared Services

Agreements because under those agreements, the lawyers and accountants were

shared employees of NexPoint and HCMFA.  And importantly, Mr. Seery himself

admitted that the Shared Services Agreements were ambiguous: "But I think that

that document, whether it's intended to be broad or not, is certainly ambiguous in

places."  [R 009136]

Under the Shared Services Agreement between NexPoint and the Debtor, the

Debtor agreed to provide the following broadly-defined services and shared

employees to NexPoint:

> (a)       *Back- and Middle-Office.*  Assistance and advice with
> respect to back- and middle-office functions, including trade execution
> and settlement, finance and accounting, payments, operations, book
> keeping, cash management, cash forecasting, accounts receivable,
> expense reimbursement, vendor management, and information
> technology (including, without limitation, general support and
> maintenance (OMS, development, support), telecom (cellphones,
> telephones and broadband) and WSO);

> (b)       *Legal/Compliance/Risk Analysis.*  Assistance and advice
> with respect to legal issues, litigation support, management of outside
> counsel, compliance support and implementation and general risk
> analysis;

***

(j)    *Shared Employees.*  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(k)    *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

(l)    *Other*.  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

[R 007702-04]

The only limitation on these broadly-defined shared services was that they did not include investment advisory services:

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, … other than the back- and middle-office services contemplated herein.

[R 007704]

Given the ambiguous—and indisputably broad—definition of shared services under the Shared Services Agreements, it is impossible to discern how the bankruptcy court arrived at its conclusion that "Mr. Dondero communicated with Highland inhouse general counsel Scott Ellington … about all kinds of things post-TRO *other* than shared services, including Mr. Dondero's personal litigation

strategies."[14]  [R 000094 (emphasis in original)]  Moreover, given the breadth of the shared services exception, that conclusion lacks evidentiary support.

Thus, the TRO is not clear and unambiguous, particularly its exception for shared services.  Accordingly, the bankruptcy court impermissibly held Mr. Dondero in contempt for allegedly violating that provision of the TRO, and its Contempt Order must be reversed for this additional reason.

### III.    The bankruptcy court improperly assessed sanctions against Mr. Dondero.

"'Civil contempt can serve two purposes,' either coercing compliance with an order or 'compensat[ing] a party who has suffered unnecessary injuries or costs because of contemptuous conduct.'"  *Ingalls v. Thompson (In re Bradley)*, 588 F.3d

---

[14] Among the communications the bankruptcy court found violated the TRO were four communications between Mr. Dondero's counsel and Mr. Ellington.  [R 6730, 6747, 7593, 7595]  Three of these communications involved Mr. Dondero's counsel Michael Lynn inquiring of Mr. Ellington about identifying a witness to subpoena for an upcoming hearing.  [R 006730, 007593, 007595]  In another, Mr. Dondero's lawyers forwarded a copy of a Common Interest Agreement to Mr. Ellington.  [R 006747]  Mr. Ellington testified at his deposition that it was his common practice as general counsel for Highland to identify witnesses for opposing counsel, and "[i]n regards to former Judge Lynn, Mr. Seery's direct instructions were, you can talk to Judge Lynn as much as you want, he's an ethical guy."  [R 008226] Mr. Dondero attempted to admit this deposition testimony or call Mr. Ellington live at the hearing, but the bankruptcy court denied his requests to do so.  [R 008202, 008241]

Moreover, the TRO contained a footnote that provided: "For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from seeking judicial relief upon proper notice or from objecting to any motion filed in the above-referenced bankruptcy case." [R 0063008] Despite this provision, the bankruptcy court cited these four communications by Mr. Dondero's lawyers to the Debtor's general counsel as violations of the TRO.  [R 000094-96]  While the footnote was ostensibly placed in the TRO for the protection of Mr. Dondero, the footnote was meaningless under the Debtor's interpretation.

---

254, 263 (5th Cir. 2009) (quoting *Travelhost*, 68 F.3d at 961-62).   Before a compensatory penalty in a civil contempt proceeding can be imposed, the Fifth Circuit requires "a sufficient record basis for the propriety of such an award and, in a broad sense at least, the amount of it." *Clark v. Boynton*, 362 F.2d 992, 998 (5th Cir. 1966).

Here, the bankruptcy court assessed a sanction against Mr. Dondero of $450,000, with an additional $100,000 sanction for each level of rehearing or appeal that he pursues.  [R 000112] Both sanctions are erroneous and must be reversed.

### A. The bankruptcy court lacked authority to assess a sanction that punishes Mr. Dondero for exercising his right to appeal.

The bankruptcy court erred by imposing an additional $100,000 sanction for "each level of rehearing, appeal, or petition for *certiorari*" Mr. Dondero may choose to pursue regarding the Contempt Order.  [R 000112]  By assessing a separate monetary sanction for every unsuccessful appeal, the bankruptcy court improperly imposed a *punitive* sanction against Mr. Dondero for exercising his appellate rights.[15]

---

[15] A bankruptcy court has authority to issue only civil contempt sanctions—either to coerce compliance or compensate an injured party. *See In re Gervin*, 337 B.R. 854, 858 (W.D. Tex. 2005) (citing *United States v. United Mine Workers*, 330 U.S. 258 (1947)).  A bankruptcy court, however, lacks the authority to impose punitive sanctions under its inherent powers. *See In re Hipp, Inc.*, 895 F.2d 1503 (5th Cir. 1990) ("bankruptcy courts have no inherent or statutory power – and none is granted them by 11 U.S.C. § 105 or by 28 U.S.C. § 157 or by Rule 9020 – to preside over section 401(3) criminal contempt trials for violation of bankruptcy court orders").  The Fifth Circuit has explained the difference:

The $100,000 sanction for each level of appeal neither coerces compliance nor compensates an injured party.  Instead, it was designed to discourage Mr. Dondero from exercising his right to seek appellate review of the Contempt Order and to punish him if he unsuccessfully does so.  Even if this sanction could be viewed as compensatory, the bankruptcy court lacked authority to impose such a punitive sanction for the filing of an unsuccessful appeal.  And if the purpose of the $100,000 sanction was to punish Mr. Dondero for appealing the Contempt Order, it effectively imposes an impermissible criminal contempt sanction.  *See Grossman*, 531 F. App'x at 446.

Even if the $100,000 sanction for each level of appeals does not cross the line that separates a civil sanction from a criminal sanction, the Supreme Court and the Fifth Circuit have generally held that lower courts cannot sanction parties for appeals or award attorney's fees for an appeal.  In *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990), the Supreme Court held that Federal Rule of Civil Procedure 11 does not permit the award of attorney's fees incurred in connection with the appeal of a lower court's sanction order.  *Id.* at 406-08.

---

In determining whether a contempt judgment imposed a criminal or civil sanction, we consider the primary purpose for which the contempt order was entered: If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.

*Grossman v. Belridge Grp. (In re Lothian Oil, Inc.)*, 531 F. App'x 428, 446 (5th Cir. 2013).

In *Franklin v. Elliott (In re Elliot)*, the Fifth Circuit held that the policies articulated in *Cooter* "apply in the context of sanctions awarded under a court's inherent powers as well as the Rule 11 context."  No. 93-1537, 1994 U.S. App. LEXIS 41963, at *1-3 (5th Cir. 1994).  The Court explained:

> If a lower court were to award attorneys' fees for the appeal of a sanction order, meritorious appeals would be discouraged and it would have the effect of encouraging additional satellite litigation. Furthermore, as the Supreme Court noted in *Cooter*, Fed. R. App. 38 governs the litigant's conduct on appeal.  As in *Cooter*, the anomalous result that a litigant would be awarded attorneys' fees on appeal when that litigant would not entitled to fees under Fed. R. App. P. 38 could result.

*Id.*

Several years later, in *Conner v. Travis County*, the Fifth Circuit explicitly held that "district courts cannot generally sanction parties for appeals."  209 F.3d 794, 800 (5th Cir. 2000).  The Court explained:

> By contrast, other circuits have held—even post-*Chambers*—that district courts cannot generally sanction parties for appeals. We are persuaded by precedent and the policies underlying a court's ability to sanction that the latter approach [of not sanctioning parties for appeals] is the better one.

*Id.*

Here, the bankruptcy court lacked any authority to impose the $100,000 sanction for Mr. Dondero's efforts to appeal.  This is true even if the $100,000 sanction was intended to compensate the Debtor for having to incur additional legal fees in an appeal.  *See Law Office of Francis O'Reilly, Esq. v. Silene Fin. L.P. (In re*

*DiBattista)*, No. 20-cv-4620, 2020 U.S. Dist. LEXIS 222877 (S.D.N.Y. Nov. 25, 2020) ("a bankruptcy court lacks authority to award fees related to an appeal").[16]

Because the bankruptcy court had no authority to impose a sanction of $100,000 for each level of appeal that Mr. Dondero may choose to pursue, that award must be reversed regardless of whether the Contempt Order is otherwise upheld.

### B. The Debtor failed to carry its burden of proving that its attorney's fees were reasonable and necessary.

The bankruptcy court correctly recognized that "[t]he Debtor did not attempt to quantify any potential economic harm to the Debtor from Mr. Dondero's prohibited conversations with Debtor employees and attempted interference with trading." [*Id.*] But the court nonetheless assessed a $450,000 sanction against Mr. Dondero, noting that "[a]s far as harm from noncompliance, the Debtor presented invoices of the fees incurred by its counsel relating to the TRO and Contempt Motion." [*Id.*]. This ruling is erroneous because the Debtor failed to meet its burden of proving that its claimed fees were both reasonable and necessary.

In a contempt proceeding, "[o]nce the court has determined the party is entitled to attorney's fees, the lodestar method determines the reasonableness of

---

[16] If the bankruptcy court intended the $100,000 sanction to be punitive, it also lacked authority to so impose such a sanction. *In re Hipp, Inc.*, 895 F.2d 1503 (5th Cir. 1990) ("bankruptcy courts have no inherent or statutory power – and none is granted them by 11 U.S.C. § 105 or by 28 U.S.C. § 157 or by Rule 9020 – to preside over section 401(3) criminal contempt trials for violation of bankruptcy court orders").

attorneys' fees." *Atlas Trading Conglomerate Inc. v. AT&T Inc.*, No. 3:15-CV-0404-K, 2018 U.S. Dist. LEXIS 33032, at *10-11 (N.D. Tex. 2018) (citing *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013)).  "Under this method, the district court must determine the reasonable number of hours expended on the litigation and the reasonable hourly rates for the participating attorneys, and then multiply the two figures together to arrive at the 'lodestar.'" *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 822 (5th Cir. 1997).  A party seeking attorney's fees is "charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving that they exercised billing judgment." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006). *See also Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974).

Here, the Debtor made no effort to carry its burden of showing the reasonableness and necessity of the claimed fees.  The Debtor merely introduced 87 pages of unsegregated fee statements without a sponsoring witness or affidavit—over Mr. Dondero's objections.  [R 008109-96, 009150-53]  These fee statements began with time entries on November 3, 2020—over a month before the TRO was issued on December 10, 2020.  [R 008109]  In fact, the first twelve pages of the Debtor's fee statements contained time entries before December 10, 2020. [R 008120]  None of these entries relate to Mr. Dondero's alleged violations of the TRO.

Because the Debtor submitted 87 pages of statements containing time entries unrelated to the Contempt Motion, it was incumbent on the Debtor to offer evidence demonstrating that the fees were reasonable and necessary to address the alleged violations of the TRO.  But the Debtor offered no testimony in support of the lodestar factors.  The Debtor therefore failed to carry its burden of demonstrating the reasonableness and necessity of its attorney's fees, and the $450,000 sanction should be reversed for this reason alone.

### C. The bankruptcy court's fee award lacks evidentiary support.

Not only did the Debtor provide no evidence of reasonableness and necessity, it also required the bankruptcy court to wade through 87 pages of fee statements—dating back over a month before the issuance of the TRO—and determine which fees were recoverable and which were not.  Astonishingly, the bankruptcy court did just that.  But without any sponsoring testimony for the 87 pages, the bankruptcy court was forced to make assumptions that lacked any evidentiary support.

"If the sanctions imposed are substantial in amount, type, or effect, appellate review of such awards will be inherently more rigorous; such sanctions must be quantifiable with some precision."  *Topalian v. Ehrman*, 3 F.3d 931, 936-37 (5th Cir. 1993) (holding that a sanction of $300,000 in attorney's fees is an amount that "clearly belongs near the upper end of the 'sliding scale' described in *Thomas*").

There must be "some connection between the amount of monetary sanctions [the court] imposes and the sanctionable conduct by the violating party." *Id.* at 937.

In the Contempt Order, the bankruptcy court stated:

> As far as attorneys' fees incurred relating to the TRO and Contempt Motion, the Debtor presented invoices of the fees incurred by its primary bankruptcy counsel, Pachulski Stang, during December 2020 and January 2021, pertaining to "Bankruptcy Litigation"—much of which it represented related to its attorney time devoted to the Contempt Motion. The Debtor admitted that there were some other litigation matters mixed in these invoices. Total December fees were $526,686. The court has reviewed the December invoice and conservatively *estimates* that **$170,919** of the fees related to the TRO and the Contempt Motion (other fees appears to relate to other litigation matters such as the HarbourVest settlement, Pat Daugherty issues, UBS, demand note litigation, and Dugaboy claims). Total January fees were $698,770. The Court has reviewed this invoice and conservatively *estimates* that **$195,002** of the fees reflected in the January 2021 invoice related to the TRO and Contempt Motion (again, other fees appeared to relate to other litigation matters such as UBS and other litigation). These two sums total **$365,921**.

[R 000110-11 (emphasis in italics added)]

Starting with $365,921, the bankruptcy court "*assume[d]*" that the Debtor incurred an additional $33,400 in fees because the "court was presented with no invoices for February or March." [R 000111 (emphasis added)] Then, the court determined that it was "*reasonable to round* the $399,321 number up approximately $50,000, to $450,000" because of "extra items." [*Id.* (emphasis added)] These "extra items" included (i) deposition transcripts that the bankruptcy court "assume[d] … resulted in many thousands of dollars of additional expenses," (ii)

unsubmitted fees for the Debtor's local counsel, and (iii) unsubmitted fees by the attorneys for the unsecured creditors' committee. [*Id.*]

Therefore, the bankruptcy court estimated nearly $85,000 in additional sanctions for attorneys, a paralegal, local counsel, deposition transcripts, and even the creditors' committee—which the bankruptcy court found "had counsel monitoring all of this." [*Id.*] As these statements confirm, the bankruptcy court's entire award was not based on evidence, but instead on its insupportable guesses and assumptions about the reasonableness and necessity of the fees allegedly incurred. The award must be reversed for this additional reason.

### D. The bankruptcy court's fee award erroneously reimburses the Debtor for fees not caused by the alleged contemptuous conduct.

Not only is there no evidentiary support for the court's fee award, the sanction imposed against Mr. Dondero is additionally flawed because it improperly reimburses the Debtor for fees that were not caused by the conduct the bankruptcy court held to be contemptuous. In calculating its sanction, the bankruptcy court indicated it was reimbursing the Debtor for "attorneys' fees and expenses incurred *relating to the TRO* and Contempt Motion." [R 000100] (emphasis added). By reimbursing the Debtor for attorney's fees in the broad category of "relating to the TRO," the bankruptcy court erroneously imposed a sanction against Mr. Dondero based on attorney's fees that were not incurred as a result of the conduct held to be contemptuous. Instead, in violation of established precedent, the bankruptcy court

erroneously awarded the Debtor fees for obtaining the TRO and for other matters not caused by the alleged contemptuous conduct. *See Fox v. Vice*, 563 U.S. 826, 836 (2011) ("The complaining party . . . may recover only the portion of his fees that he would not have paid but for the misconduct.").

Moreover, because the bankruptcy court determined that Mr. Dondero could not be held in contempt for the majority of the allegations contained in the Contempt Motion, the court's broad fee calculation improperly reimburses the Debtor for time it spent prosecuting meritless claims. Accordingly, for this additional reason, the bankruptcy court's $450,000 sanction must be reversed.

In *Goodyear Tire & Rubber Co.*, the United States Supreme Court instructed:

> [T]he court can shift only those attorney's fees incurred because of the misconduct at issue. Compensation for a wrong, after all, tracks the loss resulting from that wrong. So as we have previously noted, a sanction counts as compensatory only if it is "calibrate[d] to [the] damages caused by" the bad-faith acts on which it is based. A fee award is so calibrated if it covers the legal bills that the litigation abuse occasioned. But if an award extends further than that—to fees that would have been incurred without the misconduct—then it crosses the boundary from compensation to punishment. Hence the need for a court, when using its inherent sanctioning authority (and civil procedures), to establish a causal link—between the litigant's misbehavior and legal fees paid by the opposing party.

137 S. Ct. 1178, 1186 (2017). "That kind of causal connection . . . is appropriately framed as a but-for test: The complaining party . . . may recover only the portion of his fees that he would not have paid but for the misconduct." *Id.* (quoting *Fox*, 563 U.S. at 836) (internal quotations omitted).

Here, the bankruptcy court erroneously failed to apply the "but for" test in calculating its sanction award. For example, the Contempt Order explicitly states that it was compensating the Debtor for December 2020 fees it incurred "relating to the TRO." [R 000055-57] The TRO was not issued until December 10, 2020. Thus, all fees that the Debtor incurred before December 10—including those relating to obtaining the TRO—are not recoverable. Yet the Contempt Order expressly awards the Debtor these unrecoverable fees.

Even as to conduct occurring after December 10, 2020, the Contempt Order similarly fails to distinguish between the fees incurred "but for" the contemptuous conduct (which may be recoverable) and those incurred as a result of the TRO, the Debtor's unsuccessful pursuit of numerous claims in the Contempt Motion, and other tangential litigation matters (which are not recoverable). For example, the Contempt Motion contained six categories of allegations of contempt against Mr. Dondero. [R 006613-006626] The bankruptcy court, however, held Mr. Dondero in contempt for only two of the categories. [R 000047, 000049] The bankruptcy court's overly-broad fee award fails to differentiate between these fees. In fact, a substantial amount of the motion practice, briefing, discovery, and hearing time was devoted to conduct that the bankruptcy court held was not contemptuous, or was otherwise not

related to the Contempt Motion.[17] [R 008109-008153] By making fruitless allegations of contempt, the Debtor needlessly increased the complexity and expense of the proceeding. Thus, a substantial amount of the Debtor's attorney's fees were incurred by its own making. Any such fees are not tailored to the contemptuous conduct and are not recoverable.

For these reasons, and even with respect to post-December 10, 2020 conduct, the bankruptcy court's fee award is not calibrated to any damages caused by the conduct found to be contemptuous. The award must be reversed for this additional reason. *See Goodyear Tire & Rubber Co.*, 137 S. Ct. at 1186.

---

[17] For example, in addition to fees related to obtaining the TRO in the first place, and later seeking the preliminary injunction that would be heard on January 8, 2021, a substantial amount of Debtor's attorney's fees for December related to motions that the court held not to be contemptuous, including (i) Mr. Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business [Bankr. Dkt. 1439] [R 000319, 000323] (this motion was filed on November 19, 2020, but withdrawn before the December 16, 2020 scheduled hearing date); and the (ii) Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Bankr. Dkt. 1528] (the "CLO Motion") filed by the Funds and Advisors [R 000332, 000826-836] and the related discovery, depositions, and hearings that occurred. [R 008120 – 008136] In addition, around this same time and as retaliation for the filing of the CLO Motion by the Funds and Advisors, the Debtor separately sought a TRO against these non-parties and incurred substantial fees in December 2020 related to this new action. [R 008145-008153] (e.g., "Draft Complaint and Memo of Law in support of TRO against Advisors, Funds, CLO Holdco (7.5)"). Moreover, the Debtor's invoices did not suggest Mr. Dondero's alleged TRO violations until December 22, 2020 at the earliest. [R 008139]

## CONCLUSION

For the foregoing reasons, this Court should reverse the *Memorandum Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of the TRO*, and all sanctions ordered therein, render judgment that the Debtor take nothing on its motion to hold Mr. Dondero in contempt, and for all other relief to which Mr. Dondero may be entitled.

Dated: November 8, 2021          Respectfully submitted,


                                 */s/ Bryan C. Assink*
                                 John T. Wilson IV
                                 State Bar I.D. No. 24033344
                                 Clay M. Taylor
                                 State Bar I.D. No. 24033261
                                 Bryan C. Assink
                                 State Bar I.D. No. 24089009
                                 BONDS ELLIS EPPICH SCHAFER JONES LLP
                                 420 Throckmorton Street, Suite 1000
                                 Fort Worth, Texas 76102
                                 (817) 405-6900 telephone
                                 (817) 405-6902 facsimile
                                 Email: john.wilson@bondsellis.com
                                 Email: clay.taylor@bondsellis.com
                                 Email: bryan.assink@bondsellis.com

                                 -and-

                                 Jeffrey S. Levinger
                                 State Bar I.D. No. 12258300
                                 LEVINGER PC
                                 1700 Pacific Avenue, Suite 2390
                                 Dallas, Texas 75201
                                 (214) 855-6817 telephone
                                 (214) 817-4509 facsimile
                                 Email: jlevinger@levingerpc.com

                                 **ATTORNEYS FOR APPELLANT
                                 JAMES DONDERO**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on November 8, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Appellee and all other parties requesting or consenting to such service in this case.

*/s/ Bryan C. Assink*
Bryan C. Assink

## CERTIFICATE OF COMPLIANCE WITH RULE 8015(h)

1.     This document complies with the type-volume limitation of Fed. R. Bankr. P. 8015(h) as it contains 12,687 words, excluding the portions of the document exempted by Fed. R. Bankr. P. 8015(g).

2.     This brief complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type style requirements of Fed. R. Bankr. P. 8015(a)(7)(B) because its has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 pt. Times New Roman (and 12 point for footnotes).

*/s/ Bryan C. Assink*
Bryan C. Assink